# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

Records and information associated with the cellular
telephone assigned call number 414-242-3325, ("the
Account"), that are stored at premises controlled by
T-Mobile ("the Provider"), headquartered at 12920 SE
38th St., Bellevue, WA, 98006. See Attachment A.

)
)
)
)
)
)

Case No. **19- MJ- 1265**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☐ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Sections 1951(a) and 2, and 924(c) and 2

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent David Kowalski, FBI
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: **6/18/19**

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin          Honorable William E. Duffin, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, David Kowalski, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number **414-242-3325** ("the SUBJECT PHONE") that is stored at premises controlled by T-Mobile, a wireless telephone service provider headquartered at 12920 SE 38th St., Bellevue, WA, 98006. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation and have been so employed since April 2009. Since August 2018, I have been assigned to the Milwaukee FBI Violent Crime Task Force. I have participated in numerous complex narcotics, money laundering, violent crime, armed bank robbery, and armed commercial robbery investigations in violation of Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 924(c), 1951, 1956, 1957, 2113, and other related offenses. I have employed a wide variety of investigative techniques in these and other investigations, including but not limited to, the use of informants, wiretaps, cooperating defendants, recorded communications, search warrants, surveillance, interrogations, public records, DNA collection, and traffic stops. I have also received formal training regarding the same.

3.     I have conducted and/or assisted with investigations of violent crime and narcotics violations in conjunction with agents and officers from other jurisdictions, and have received training from these agents and officers in conducting these investigations. I have also conducted and/or assisted with investigations that have led to the arrest of persons for violations of law dealing with commercial robberies.

4.     This affidavit is based upon my personal knowledge, my training and experience, and on information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon police reports, official records, citizen witnesses' statements, consent searches, recorded statements, law enforcement surveillance, surveillance video, social media, court records, telephone records, and public records which I consider to be reliable as set forth herein. The facts of this Affidavit are based upon information obtained from my investigation, as well as information I have received from other law enforcement officers.

5.     Based on the investigation to date, I submit that there is probable cause to believe that Nickie M. Foster (DOB XX/XX/1995), Marquel L. Johnson (DOB XX/XX/1994), and Martell D. Ford (DOB XX/XX/1990) conspired to commit and committed a series of armed robberies and attempted armed robberies in Milwaukee, Wisconsin, between August 22, 2018, and August 25, 2018, in violation of Title 18, United States Code, Sections 1951(a) and 2 (Hobbs Act robbery), and 924(c) and 2 (use, brandishing, and discharge of a firearm during a crime of violence).

## PROBABLE CAUSE

6.     I am involved in the investigation of a series of armed robberies of taxi cab drivers and gas station employees in the Milwaukee area between at least August 22, 2018 and August 25, 2018. The taxi cab companies and gas stations included in this affidavit are businesses involved

2

in interstate commerce, and the below-described robberies affected interstate commerce.

**Armed Robbery of Taxi Cab Driver –August 22, 2018 (12:49 p.m.)**

7. In the early afternoon on August 22, 2018, an individual using telephone number **414-242-3325**, contacted United Blue Taxi and requested a pickup for an individual by the name of, "Scoobby [sic]" at 1014 S. 4th Street, Milwaukee, Wisconsin. Shortly thereafter, A.S., a taxi cab driver for United Blue Taxi, arrived at this address. At approximately 12:49 p.m., a black female (Subject #1) entered the rear passenger seat of A.S.'s cab and requested to be taken to the area of S. 14th and W. Washington Streets in Milwaukee, Wisconsin. Upon arriving at this destination, A.S. requested payment for the fare. Subject #1 then produced a silver semi-automatic handgun and pointed it at A.S.'s face and temple while demanding money from A.S. Subject #1 then told A.S., "You have two minutes, give me the stuff!" A.S. gave Subject #1 his wallet. Subject #1 then exited A.S.'s vehicle and entered a tan sedan, which was driven by another individual. As Subject #1 was exiting A.S.'s vehicle, Subject #1 dropped a black wallet containing a State of Wisconsin Identification card bearing the name Nickie M. Foster (Foster), with date of birth XX/XX/1995. The wallet also contained a Wisconsin Quest card and a Forward Health Insurance card, both bearing Foster's name. Several debit cards with names other than Foster's were also located within the wallet.

8. When interviewed by responding officers, A.S. stated that he believed he was robbed by a black male; however, a review of the video recording device inside A.S.'s United Blue Taxi cab from the time of this incident shows Suspect #1's physical appearance to be consistent with the photographs of Foster maintained in various law enforcement/government databases. A.S. also stated that the handgun brandished during the robbery was black or brown; however, it is clear in the surveillance footage that the handgun was silver in color.

**Armed Robbery of Taxi Cab Driver – August 22, 2018 (6:09 p.m.)**

9.      In the early evening on August 22, 2018, an individual using telephone number **414-242-3325** contacted American United, a Milwaukee, Wisconsin-based taxi company, and requested a pickup for an individual by the name of, "Scooby" at 715 S. 34th Street, Milwaukee, Wisconsin. Shortly thereafter, R.M., a taxi cab driver for American United, arrived at this address. At approximately 6:09 p.m., a subject entered the rear passenger seat of R.M.'s cab and directed him to start driving. After driving a few car lengths, the subject produced a silver handgun and ordered R.M. to pull over and throw his keys out of the window. R.M. complied and was then ordered to look away and turn over his property. R.M. gave the subject his cellular telephone and his wallet, which included his identification, approximately $570, and his debit card. The subject then exited R.M.'s vehicle and got into a bronze or orange car with rear end damage, which was parked nearby, and drove away.

10.      When interviewed by responding officers, R.M. stated that he was unsure if he was robbed by a black male or female. A review of the video recording device inside R.M.'s American United cab from the time of this incident does not provide a clear view of the subject's face; however, the clothing worn by the subject, the style of the subject's hair, and the handgun brandished are consistent with Foster's appearance in the earlier United Blue Taxi robbery.

**Armed Robbery of Taxi Cab Driver – August 22, 2018 (9:38 p.m.)**

11.      In the late evening on August 22, 2018, a female caller contacted M.B., a taxi cab driver for American United, on M.B.'s work phone, and asked to be picked up at 1515 S. 5th Street, Milwaukee, Wisconsin. M.B. agreed and drove to the location, arriving at approximately 9:38 p.m. Upon arrival, M.B. encountered his black female passenger (Subject #1) standing on the side of the road. Subject #1 asked M.B. if she could sit in the front, but he directed her to sit in the

back. Subject #1 entered the rear passenger seat and immediately produced a silver handgun. Subject #1 told M.B. not to turn around and threatened to shoot him if he did. Subject #1 demanded M.B.'s money and M.B. complied. While M.B. was giving his money to Subject #1, a black male (Subject #2) entered the front passenger door and began searching M.B.'s person for additional valuables. Subject #2 took M.B.'s cellular telephone and Subject #1 and Subject #2 took cash from M.B. At some time during the robbery, Subject #1 struck M.B. in the head with the pistol. Subject #1 and Subject #2 then exited M.B.'s vehicle and got into a tan Pontiac sedan.

12.     I have compared the surveillance footage with a known photo of Martell Ford. Subject #2's face and physical characteristics appear consistent in all respects with Ford.

13.     A review of the video recording device inside M.B.'s American United cab from the time of this incident show's Subject #1 wearing similar clothing and carrying the same handgun used by the female subject, identified as Foster, in the two previous robberies. This video also shows a distinctive tattoo on Subject #1's right upper arm.

**Attempted Armed Robbery Outside of Petro Mart – August 22, 2018 (10:30 p.m.)**

14.     At approximately 10:30 p.m. on August 22, 2018, while walking to the Petro Mart gas station located at 2341 S. Chase Avenue, Milwaukee, Wisconsin, A.G. was confronted by a black female (Suspect #3) wearing a grey sweatshirt with a hood over her head. Suspect #3 produced a handgun, which she pointed at A.G.'s face, and demanded money. A.G. stated he did not have any money, at which point Suspect #3 pulled the trigger of the gun twice but it did not fire. A.G. attempted to wrestle the gun away from Suspect #3 and both individuals fell to the ground. While on the ground, a black male exited a tan sedan and began coming towards A.G. and Suspect #3. A.G. then pushed Suspect #3 and fled into the store. When A.G. and the Petro Mart attendant looked outside a short while later, Suspect #3 and the black male were gone.

5

**Armed Robbery of Taxi Cab Driver – August 23, 2018 (1:30 a.m.)**

15.     At approximately 1:14 a.m. on August 23, 2018, an individual using telephone number **414-242-3325** contacted All-City Veterans Taxi and requested a pickup for an individual by the name of "Unique" at 4200 N. Holston Street, Milwaukee, Wisconsin. Shortly thereafter, J.M., a taxi cab driver for All-City Veterans Taxi, received an order on his in-board computer to complete the pickup, which he accepted at approximately 1:05 a.m. At approximately 1:28 a.m., J.M. arrived at the address, which was a daycare facility that appeared closed. After waiting for about five minutes, J.M. was approached by a black female, who J.M. to be in her late teens, between 5'0" and 5'2" tall, weighing approximately 120 pounds, and wearing an orange hooded sweatshirt and tan shorts. The woman, who identified herself as, "Tony Unique," (Unique) entered J.M.'s cab and requested to go to the intersection of 6th and Chambers Streets in Milwaukee, Wisconsin. Upon nearing the destination, Unique asked to be dropped off in the alley between 6th and 7th Street on Chamber Street. J.M. told her that he would not drop her off in the alley and parked in front of 618 W. Chambers Street. As J.M. was waiting to be paid his fare, Unique produced a silver handgun, put the gun to J.M.'s head, and then ordered him to put his head on the steering wheel. Unique then told J.M., "I'll kill you on the spot" and demanded his wallet and cellular telephone. Unique hit J.M. in the back of the head with the handgun and then directed him to turn off the car and throw the keys out the window. J.M. did as he was instructed and then gave Unique his cellular telephone and his wallet with approximately $30 in cash, several debit cards, and his identification card.

16.     After receiving the property, Unique told J.M. not to turn around for five minutes and then exited the vehicle. Shortly thereafter, J.M. exited the vehicle to get his keys. When he did, he observed Unique standing at the entrance to the nearby alley with the gun in her hand.

6

Unique then pointed the gun at him and fired one shot, which J.M. stated sounded like it was a low caliber round because it was not very loud. After firing the shot, Unique ran north through the alley. J.M. grabbed his keys and immediately drove to the local police station to report the incident.

17.    Upon receiving this report, law enforcement officers travelled to the area near 618 W. Chambers Street and attempted to locate a shell casing that evening, but were unable to do so due to the poor lighting conditions. Officers returned to the scene on the morning of August 23, 2018, and located one .22 caliber shell casing in the area near where J.M. stated Unique was standing.

**Petro Mart Gas Station Armed Robbery – August 23, 2018 (2:30 a.m.)**

18.    At approximately 2:30 a.m. on August 23, 2018, two female subjects entered the Petro Mart gas station located at 2341 S. Chase Avenue, Milwaukee, Wisconsin. The first subject (Subject #1) was wearing the same cut-off tan shorts from the taxi cab robberies in the preceding 24 hours and was wearing blue gym shoes. Subject #1's physical features were in all respects consistent with Foster. The other subject (Subject #3) was wearing a grey hooded sweatshirt with the hood up, similar to the one described by A.G. in the attempted robbery at the same Petro Mart just a few hours earlier, as described above. As Subject #3 entered the gas station, Subject #3 removed a bottle of automotive fluid from a store shelf and used it to prop open the front door to the store. Based on my training and experience, I know that individuals who plan to commit robberies of commercial stores frequently try to defeat the remote controlled magnetic locks on stores by propping the door open or by having a co-actor hold it open.

19.    Subject #1 then approached the store attendant, M.B., produced a silver handgun, and shot M.B. in the head. After shooting him, Subject #1 stepped over M.B., who had fallen to

7

the ground, and walked to the cash register, which was in a glass-enclosed area. Subject #1 opened the register and took the cash contained within. As she collected the money, Subject #1 passed the silver handgun through an opening in the cash register area to Subject #3, who took possession of the weapon and subsequently pointed it at M.B., who was still on the ground. At approximately 2:30 a.m., Subject #1 and Suspect #3 exited the store. M.B. survived the shooting, but requires ongoing medical care and continues to endure significant cognitive impairments from the shooting. The bullet remains in M.B.'s head and cannot be surgically removed.

20. The surveillance footage showed the activity described above. One camera view showed Subject #1 holding the silver pistol in her outstretched right hand. In the footage, the outlines of two tattoos are visible on Subject #1's right arm. Two consistent tattoos are visible on Subject #1's right arm in the footage for the robbery of taxi cab driver M.B. on August 22, 2018, at approximately 9:38 p.m., just a few hours before the Petro Mart robbery. In addition, the Petro Mart surveillance footage shows that Subject #1 was wearing cut-off shorts. Subject #1's shorts appear consistent with Subject #1's shorts from the surveillance footage of the robbery of taxi cab driver R.M. on August 22, 2018, at 6:09 p.m.

**Recovery of Suspect Vehicle – August 23, 2018 (5:59 p.m.)**

21. On August 23, 2018, at approximately 5:59 p.m., law enforcement officers located a 2000 Pontiac Grand Am, gold in color, bearing Wisconsin license plate: 549-TAH, with VIN: 1G2NF52T6YM864942, which matched the description of the subject vehicle used in several of the aforementioned robberies. The vehicle, which had all of the windows broken out, was parked on the road near 2268 S. 17th Street, approximately one mile from the Petro Mart described above. During a search of the vehicle, law enforcement officers recovered a number of items, including the following:

8

a.      a Wisconsin Driver's License bearing the name of A.S., one of the taxi cab robbery victims;

b.      a Wisconsin Driver's License bearing the name of M.B., one of the taxi cab robbery victims;

c.      a City of Milwaukee Driver's License bearing the name R.M., one of the taxi cab robbery victims; and

d.      blue Nike shoes consistent with those worn by Subject #1 (Foster) during the Petro Mart robbery that had occurred less than 16 hours earlier.

22.      While searching the vehicle, officers also recovered two cards listed to Marquel Johnson (Johnson): a Wisconsin Quest card and a Potawatomi Fire Keeper's Card. In addition, officers recovered a prescription inhaler for Johnson that was filled at Walgreens pharmacy at 2410 West Forest Home Avenue on the south side of Milwaukee. Subsequent queries of various law enforcement databases produced several photographs of Johnson matching the physical description of Subject #3 in the robberies above. Law enforcement also queried Facebook.com for the name, "Marquel Johnson," which returned the account: https://www.facebook.com/marquel.johnson.3956. The Facebook User ID associated with this account is: 100013929930536. A review of the publicly viewable postings associated with this account revealed multiple pictures matching the physical description of Subject #3 in the robbery outside Petro Mart and robbery of Petro Mart on August 22 and August 23, respectively, as well as the known photographs of Johnson, which were previously located in the various law enforcement databases.

23.      The following photograph was observed on Johnson's Facebook account with a post date of August 19, 2018:



Based on my training and experience, I know the term "22" in the above photograph is a reference to .22 caliber, which is the same size ammunition recovered from the robbery of taxi-cab driver J.M. in the early morning hours of August 23, 2018. The handgun in this photograph is consistent with the silver handgun used in each of the above-described robberies, including the one that Subject #1 used to shoot the Petro Mart gas station employee in the head.

24. On August 24, 2018, through Facebook messenger, Johnson sent Facebook messages indicating that she had to "lay low" and that she couldn't "tell y on here." She proceeded to say "u can call me **4142423325**," which corresponds to the telephone number that called several of the victim taxi cab companies just prior to the robberies.

**BP Gas Station Robbery – August 25, 2018 (3:43 a.m.)**

25.     At approximately 3:43 a.m. on August 25, 2018, a female suspect (Subject #3) and a male suspect (Subject #2) exited a newer, dark-colored Chevrolet Malibu, which was parked on W. Buffalo Street and walked into the BP Welcome Mart located at 350 N. Plankinton Avenue, Milwaukee, Wisconsin.  Shortly thereafter, Subject #2 moved to the entry door and propped it open.  At approximately the same time, Subject #3 who had moved to the cashier's counter, produced a silver handgun, and demanded money from the cashier, who was located behind ballistic-proof glass.  The cashier refused to comply and when Suspect #2 exited the gas station and let the entry door close, the cashier activated the door lock, locking Subject #3 inside.  Upon observing this, Suspect #2 attempted to open the door from the outside, and when he could not, he returned to the Chevrolet Malibu and drove away.  The surveillance footage showed a distinct mud pattern on the passenger side of the dark-color Malibu.

26.     At multiple points during the surveillance footage, the female suspect's face is visible and I can identify the female suspect as Johnson.  In addition, the female suspect is wearing what appears to be the same Nike flip-flops as those worn by Subject #3 in the Petro Mart robbery.  The male suspect's face is also visible at certain points in the footage, and he appears consistent with Martell Ford.

27.     Johnson, who remained inside the gas station, continued to threaten the cashier while attempting to open the door.  Johnson eventually located another exit door which she was able to open, and fled the scene.  Neither Johnson nor Subject #3 obtained any property during this attempted robbery.

28.     Later in the day on August 25, 2018, law enforcement officers observed Johnson driving a blue Chevrolet Malibu, bearing Illinois license plate: E62-3921, with vehicle

identification number (VIN): 1G1ZC5E10BF370094, which had a distinct mud pattern on the passenger side, consistent with the vehicle observed during the BP Gas Station robbery earlier that day. When officers attempted to conduct a traffic stop, Johnson fled the scene and a high-speed pursuit was initiated. While attempting to evade law enforcement, Johnson struck two bystander vehicles, ultimately disabling her vehicle as a result of her collision with the second vehicle. Johnson was taken into custody and subsequently transported to a medical facility for treatment of injuries sustained during the crash. During the search of Johnson's person incident to arrest, officers recovered a loaded silver .22 caliber handgun from Johnson's pocket. The firearm is consistent in all respects to the firearm in Johnson's Facebook post from August 19, 2018, and the firearm brandished and discharged during the robberies. One unique feature of the firearm was black duct tape on the handle area, which is visible in some of the taxi cab surveillance footage from the robberies.

29.     On or about August 20, 2018, a blue Chevrolet Malibu, bearing Illinois license plate: E62-3921, with vehicle identification number (VIN): 1G1ZC5E10BF370094, was reported stolen from O'Hare Airport in Chicago, IL. A review of Johnson's Facebook records shows a wall post on August 19, 2018, at 7:41 p.m. that reads, "In the city Chicago bound." Then, on August 20, 2018, at 6:45 p.m., a selfie-style photograph of Johnson was posted to the Facebook page with the post "Came to the city to slap . . . one more night an on my way back to mil (with emoticons)." In the photo, Johnson appears to be in a public restroom and has a stack of U.S. currency under her chin.

30.     The stolen Chevrolet Malibu was searched after Johnson's arrest. From the front driver's side floor board, officers recovered a silver iPhone with a cracked screen. Officers

observed what appeared to be blood on the cell phone. The phone is currently in evidence under Inventory 18032155, Item #2.

31. On August 23, 2018, at 3:35 a.m., just over an hour after the Petro Mart robbery in which the gas station employee was shot in the head, the following post was added to Johnson's Facebook page:



Case 2:19-mj-01265-WED   Filed 11/22/19   Page 14 of 22   Document 1

32.     In addition, Marquel Johnson's Facebook page shows a photo posted on August 24, 2018, at 12:17 a.m., in which she is in what appears to be a hospital with a breathing apparatus, such as a nebulizer, attached to her face. The post reads, "asthma (with various emoticons)."

33.     After receiving medical treatment following her arrest on August 25, 2018, Johnson was interviewed by law enforcement while in the hospital. During this interview, Johnson acknowledged her role in at least two of the robberies detailed above: the robbery of Petro Mart; and the BP gas station robbery. Johnson stated Martell Ford was the male suspect in the robberies. Johnson stated she was with Nickie Foster and Martell Ford at the Petro Mart robbery. Johnson stated Foster had the gun and shot the clerk, then handed the gun to Johnson while Foster gathered the money. Johnson stated that on August 25, 2018, she and Ford entered the BP gas station on N. Plankinton. Johnson admitted to having the gun. Johnson also confirmed Foster's involvement in the taxi-cab robbery of M.B.

34.     Queries of various law enforcement databases revealed photographs of Ford consistent with the surveillance photos obtained during the relevant robberies involving Subject #2.

35.     On September 3, 2018, law enforcement officers conducted a custodial interview of Foster following her arrest. During that interview, Foster, after waiving her Miranda rights, acknowledged her involvement in the four taxi cab robberies, detailed above, which took place on August 22 and 23, 2018. Foster stated that Johnson drove her to and picked her up from each of these robberies. Foster was shown a prior booking photo of Ford and subsequently identified him as the male subject involved in the robbery of B.M. According to Foster, Ford was involved in a total of two or three of the taxi cab robberies.

36. During her interview, Foster also acknowledged her involvement in the Petro Mart robbery, which according to Foster, was Johnson's idea. Specifically, Foster recalled Johnson giving Foster the .22 caliber pistol and directing her to point it at the clerk. While Foster was doing this, Johnson locked the door to the store as Ford waited outside in the vehicle. Foster knew the clerk was shot, but she was not sure how it happened because her finger was not on the trigger when she pointed it at him. After collecting the money, Foster, Johnson, and Ford all left the scene together. Foster was shown a photo of the handgun recovered from Johnson at the time of her arrest and confirmed it was the same one used in each of the robberies.

37. I submit that there is probable cause to believe that the records identified in Attachment B, which correspond to telephone number **414-242-3325**, are likely to constitute evidence of the above-described robberies. According to law enforcement databases, T-Mobile was the Provider for this telephone number during the time period at issue.

38. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than

15

other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

39.     Based on my training and experience, I know that T-Mobile can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

40.     Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators.

## AUTHORIZATION REQUEST

41.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

42.     I further request that the Court direct T-Mobile to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on T-Mobile, who will then compile the requested

16

records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number 414-242-3325, ("the Account"), that are stored at premises controlled by T-Mobile ("the Provider"), headquartered at 12920 SE 38th St., Bellevue, WA, 98006.

# ATTACHMENT B

## Particular Things to be Seized

## I.  Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period August 21, 2018, and August 26, 2018:

a.  The following information about the customers or subscribers of the Account:

   i.  Names (including subscriber names, user names, and screen names);

   ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii.  Local and long distance telephone connection records;

   iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v.  Length of service (including start date) and types of service utilized;

   vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

   viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

2

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

  i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

  ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

## II.   Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 1951 & 924(c) during the period August 21, 2018, and August 26, 2018.

3

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by T-Mobile, and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of T-Mobile. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of T-Mobile, and they were made by T-Mobile as a regular practice; and

b.      such records were generated by T-Mobile's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of T-Mobile in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by T-Mobile, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                                            Signature